UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES CLYDE SMITH,<br><br>      Plaintiff,<br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>      Defendant. | Case No.: 1:14-cv-02082 – JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF JAMES CLYDE SMITH AND AGAINST DEFENDANT CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY |

      James Clyde Smith asserts he is entitled to disability insurance benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the medical evidence and seeks review of the decision denying his application for benefits. Because the ALJ failed to identify legally sufficient reasons for rejecting the opinions of Plaintiff's treating physicians, the action is **REMANDED** for further proceedings.

## PROCEDURAL HISTORY

      Plaintiff filed his application for benefits on July 19, 2011, alleging disability beginning January 1, 2009. (Doc. 10-6 at 4.) The Social Security Administration denied Plaintiff's application initially on November 10, 2011, and upon reconsideration on May 18, 2012. (Doc. 10-4 at 9, 26.) After requesting a hearing, Plaintiff testified before an ALJ on December 20, 2012. (Doc. 10-3 at 28.) The ALJ continued the hearing to send Plaintiff to a physician to receive x-rays and a consultative examination. (*Id.* at 39.) Plaintiff appeared and testified at a second hearing on January 6, 2013. (*Id.*

at 43.) The ALJ determined Plaintiff was not disabled and issued an order denying his application for benefits on June 21, 2013. (*Id.* at 9.) The Appeals Council denied Plaintiff's request for review of the decision on October 24, 2014. (*Id.* at 2.) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## **STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## **DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability,

2

the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

A.   **Relevant Medical Evidence**

Dr. Robert Izzi completed a psychiatric evaluation of Plaintiff on September 17, 2011.  (Doc. 10-8 at 15.)  Plaintiff reported he suffered from depression, panic attacks, paranoia, rage, and getting "verbally abusive." (*Id.*)  In addition, Plaintiff told Dr. Izzi that he had difficulty sleeping, "unprovoked crying spells," and "occasional problems with his eating habits and appetite."  (*Id.*) Plaintiff stated he had a history of head trauma, including "three slight concussions falling off motorcycles." (*Id.*)  Dr. Izzi observed that Plaintiff was "alert and responsive," but "seemed tense[]" and "somewhat hyper." (*Id.*) Plaintiff "was able to immediately recall three words without any obvious difficulty" and "one of three words" after a delay.  (*Id.* at 17.)  Dr. Izzi determined Plaintiff's "overall performance on the Folstein Mini Mental State Examination was within the normal range." (*Id.*)  Dr. Izzi diagnosed Plaintiff with a mood disorder, not otherwise specified, and opined:

> The present evidence suggests that the claimant does appear capable of performing simple and repetitive type task[s] on a consistent basis over an eight-hour period.  His ability to get along with peers or be supervised in a work-like setting would be moderately limited by his mood disorder.  The claimant's mood disorder can be expected to fluctuate.  Any significant fluctuation of mood would limit his ability to perform a complex task on a consistent basis over an eight-hour period.

(*Id.* at 17-18.)  Further, Dr. Izzi concluded that Plaintiff was "capable of responding to usual work session situations regarding attendance and safety issues," as well as "dealing with changes in a routine

work setting." (*Id.* at 18.)

In November 2011, Plaintiff sought treatment with Dr. Daria Majzoubi, reporting he had anxiety and depression, and wanted to establish care with a provider. (Doc. 10-8 at 57.) Dr. Majzoubi noted Plaintiff had a labile mood and indicated he may have schizophrenia or bipolar disorder. (*Id.*)

In March 2012, Dr. Majzoubi opined Plaintiff suffered from a mental illness. (Doc. 10-8 at 52.) On March 7, 2012, Plaintiff was evaluated by Maria Cardenas, a marriage and family therapist intern for Kings View Counseling Services. (*Id.* at 19.) Plaintiff told Ms. Cardenas that after being incarcerated, he believed "others are watching him and are out to get him." (*Id.*) Plaintiff said he heard voices and was "afraid to go to sleep" because he was afraid someone was "going to try to get" his girlfriend or him. (*Id.*) He believed "he could not maintain employment due to his paranoia and [he] would have 'panic attacks.'" (*Id.*) Ms. Cardenas believed Plaintiff's thought content was phobic, suspicious, and delusional. (*Id.* at 26, 28.) In addition, Ms. Cardenas observed that Plaintiff appeared attentive, but he had an impaired ability to concentrate. (*Id.* at 29.) She concluded Plaintiff would be referred to counseling and "medication services." (*Id.* at 30.)

On May 2, 2012, Dr. Mazoubi noted Plaintiff reported visual hallucinations and he had "targeted speech." (Doc. 10-8 at 52.) He diagnosed Plaintiff with "bipolar disorder [with] psychotic features." (*Id.* at 50.)

Dr. Daria Majzoubi completed a mental disorder questionnaire form on May 16, 2012.[1] (Doc. 10-8 at 43-47.) Dr. Majzoubi indicated he saw Plaintiff on a "monthly" basis, beginning in November 2011, but Plaintiff reported "several [years] of symptoms." (*Id.* at 43, 47.) He noted Plaintiff had targeted and pressured speech, and was "emotionally labile." (*Id.* at 44.) According to Dr. Majzoubi, Plaintiff was "cognitively functioning well but ha[d] delusions," as well as "[d]isorganized thoughts," paranoia, and mania. (*Id.* at 44-45.) Dr. Majzoubi believed Plaintiff was "able to follow directions [and] complete tasks." (*Id.* at 46.) However, he opined Plaintiff was unable "to interact appropriately and communicate effectively," and "unable to adapt to stressful environments." (*Id.*) Dr. Majzoubi concluded Plaintiff's prognosis was "poor." (*Id.* at 47.)

---

[1] The ALJ indicated the form was submitted by an unidentified source. However, based upon the signature on the form, the parties agree that the form was clearly completed by Dr. Majzoubi.

1         In June 2012, Plaintiff had an initial evaluation for counseling services with Dr. Mircea Truta. (Doc. 10-8 at 67-77.) Plaintiff's primary complaint was that "people watch [him]," and explained "he had to watch his back all the time" while incarcerated. (*Id.* at 67-68.) Plaintiff's girlfriend reported that he was "very irritable" and "verbally abusive to her." (*Id.* at 67.) Plaintiff told Dr. Truta he smoked cannabis prior to the evaluation, which "made him calmer," and admitted "severe past [alcohol] use." (*Id.* at 68.) Dr. Truta observed Plaintiff exhibited "poor concentration" and "talk[ed] incessantly," to the point he was "difficult to interrupt." (*Id.*) Further, Dr. Truta believed Plaintiff had paranoid delusions, based upon Plaintiff's report that he heard voices and was afraid someone would "take" his girlfriend. (*Id.*) Dr. Truta found Plaintiff had good immediate retention but was only able to recall one of three items after five minutes, and had "poor recall." (*Id.* at 70.) Dr. Truta gave Plaintiff a GAF score of 50, and recommended that Plaintiff receive individual therapy. (*Id.* at 71, 77.)

         In August 2012, Plaintiff reported he was compliant with his medication "for less than 2 weeks," and said he stopped taking it due to "daily sedation, leg swelling, leg cramping, [and] some swollen tongue." (Doc. 10-8 at 65.) Plaintiff told Dr. Truta that he felt sad, depressed and worthless. (*Id.*) Dr. Truta diagnosed Plaintiff with psychosis, not otherwise specified; mood disorder, not otherwise specified; and alcohol dependence in sustained remission. (*Id.*) Dr. Truta prescribed Geodon, and counseled Plaintiff regarding the importance of complying with treatment. (*Id.* at 66.)

         At follow-up appointments in September 2012, Plaintiff reported he was taking Geodon but felt sedated. (Doc. 10-8 at 60, 63.) Plaintiff told Dr. Truta that he was still depressed, but his mood was "better" and had "reduced anhedonia, isolation, [and] some worthlessness." (*Id.* at 63.) Dr. Truta also noted that Plaintiff's girlfriend said he was "doing better" and was "less irritable." (*Id.* at 60.)

         Dr. Truta completed a mental residual functional capacity questionnaire on October 30, 2012. (Doc. 10-8 at 79-82.) According to Dr. Truta, Plaintiff was "seriously limited" with the ability to understand, remember, and carry out very short and simple instructions; working in proximity to others; and making simple work-related decisions. (*Id.* at 79.) In addition, Dr. Truta opined Plaintiff was "unable to meet competitive standards" or maintain attention for two-hour segments, be punctual with work, perform at a consistent pace, or deal with normal work stress. (*Id.* at 79-80.) Further, Dr. Truta believed Plaintiff was unable to satisfactorily engage in many areas of social interaction, including

getting along with co-workers or peers, interacting appropriately with the general public, or maintaining socially appropriate behavior. (*Id.* at 80-81.)

Dr. Majzoubi completed a physical capabilities evaluation form on November 7, 2012. (Doc. 10-8 at 84-85.) He noted that Plaintiff had "severe lower back pain which limits his mobility." (*Id.* at 85.) Dr. Majzoubi opined Plaintiff was able to sit, stand, and walk one hour each in an eight-hour day; needed to rest four hours in an eight-hour period; and must periodically alternate sitting and standing every thirty minutes. (*Id.* at 84.) According to Dr. Majzoubi, Plaintiff was able to frequently lift and carry "up to 5 lbs." and could occasionally lift and carry up to 50 pounds. (*Id.*) Dr. Majzoubi also opined Plaintiff could never crawl, but could occasionally bend, squat, climb, kneel, and stoop. (*Id.*) He believed Plaintiff had "mild" environmental limitations, including exposure to extreme cold or heat, wetness, humidity, noise, vibration, fumes, odors, dust, gases, poor ventilation, and hazards. (*Id.*)

On November 27, 2012, Plaintiff had a medication evaluation and follow-up with Dr. Truta. (Doc. 10-9 at 19.) He reported he took the medicine as prescribed, and did not have any side effects. (*Id.*) Plaintiff said he was "feeling well, … calm, [and] less irritable." (*Id.*) Similarly, his girlfriend told Dr. Truta that Plaintiff was "doing better, less irritable." (*Id.*) Dr. Truta opined the Geodon was an effective treatment. (*Id.* at 20.)

In January 2013, Plaintiff admitted he had been forgetting to take his medication. (Doc. 10-9 at 16.) Dr. Truta noted Plaintiff said he ran out of medicine two days before the appointment, but the chart indicated he "should have been out [of it for] 3 weeks." (*Id.*) Plaintiff reported his girlfriend had moved out a week before, after Plaintiff got upset when a male friend came over and believed "they did something behind [his] back." (*Id.*) Dr. Truta opined Plaintiff's "paranoid delusions [were] moderate," and advised Plaintiff to call the counseling center if they intensified. (*Id.* at 17.) Dr. Truta again "discussed [the] importance of full compliance" with the recommended treatment. (*Id.*)

Dr. Dale Van Kirk performed a comprehensive orthopedic evaluation on February 3, 2013. (Doc. 10-8 at 95.) Plaintiff described "[l]ow back pain with radiation down both legs," with the pain greater in his left side. (*Id.*) He told Dr. Van Kirk that his "pain increase[d] if he has to lift heavy objects, twist, turn, climb, run, jump, squat, go up and down ladders, go up and down stairs frequently, crouch or crawl." (*Id.* at 95-96.) Dr. Van Kirk observed Plaintiff showed "no acute distress," sat

"comfortably in the examination chair," and was able to "get[] on and off the table without difficulty." (*Id.* at 96.) Further, Plaintiff was "able to get up on his toes and heels," as well as "squat down and take a few steps…without difficulty." (*Id.* at 97.) Dr. Van Kirk determined Plaintiff's motor strength was "normal, 5/5" in all extremities. (*Id.* at 98.) Dr. Van Kirk concluded Plaintiff "should be able to stand and/or walk cumulatively for six hours out of an eight-hour day" and "lift and carry 25 pounds frequently and 50 pounds occasionally." (*Id.*) He opined Plaintiff was "limited to only occasional postural activities including bending, stooping, crouching, climbing, kneeling, balancing, crawling, pushing or pulling because of significant residual pain in the lower back with radiation down the legs." (*Id.*) Because Plaintiff reported his symptoms were "enhanced with cold weather," Dr. Van Kirk noted Plaintiff "should not be required to work in an extremely cold and/or damp environment." (*Id.*)

Plaintiff had x-rays taken of his lumbar spine on February 4, 2013. (Doc. 10-8 at 88.) Dr. Glade Roper determined Plaintiff had "[m]ild loss of disc height at L-45 and L3-L4 with tiny anterior osteophytes at multiple levels." (*Id.*) In addition, Dr. Roper found "mild to moderate facet arthorpathy of the lower lumbar spine, particularly at L5-S1" and "[m]ild bilateral hip osteoarthritis." (*Id.*)

In February and March 2013, Plaintiff reported "compliance [with] meds." (Doc. 10-9 at 12, 14.) On March 26, Plaintiff told Dr. Truta that he felt "OK," and denied having depression, irritability, and agitation. (*Id.* at 12.) In addition, he denied having present audio or visual hallucinations. (*Id.*) Dr. Truta again opined Plaintiff's treatment was effective. (*Id.* at 13.)

Due to Plaintiff's continued reports of low back pain in April 2013, Dr. Majzoubi ordered an MRI of Plaintiff's lumbar spine. (Doc. 10-9 at 33, 40.) Dr. Julia determined Plaintiff had "[m]ultilevel degenerative changes," including:

> L3/4: There is a diffuse bulge and a superimposed small central protrusion. There is mild central canal stenosis and mild bilateral neural foraminal stenosis.
>
> L4/5: There is a diffuse bulge and a superimposed small right paracentral and central protrusion. There is a tiny central annular tear. There is impression on the thecal sac. There is moderate to severe bilateral neural foraminal stenosis.
>
> L5/S1: There is a small central annular tear. There is no significant disk bulge or herniation. There is irregularity of the right lamina/pars interarticularis, impressing on and mildly displacing the thecal sac to the left. There is severe left worse than right neural foraminal stenosis. Left neural foramen is essentially obliterated.

(*Id.* at 41.)

**B.     Administrative Hearing Testimony**

On December 20, 2012, Plaintiff appeared for a hearing before the ALJ. (Doc. 10-3 at 28.) He reported that he lived with his girlfriend, who was not employed and instead took care of him. (*Id.* at 30-31.) He stated that he did not have a valid driver's license because it was suspended, and he relied on rides from his family or used public transportation. (*Id.* at 31-32.) Plaintiff testified he had a high school education, and "some college" credits. (*Id.* at 32.) He reported he took special education classes for reading comprehension but was able to read and write. (*Id.*) In addition, Plaintiff said he had vocational training for truck driving and held a commercial license until 2006. (*Id.* at 32-33.)

He testified that he was employed as "a delivery driver and a lift operator – warehouseman" from 2003 to 2006, and then worked as "a fill-in guy" doing jobs as needed for a cotton gin in 2007. (Doc. 10-3 at 35-36.) He said he last worked as a forklift operator for SK Foods from 2007 until he went to jail in 2009. (*Id.* 33-34.) When asked if he would still be working for the plant if he had not been incarcerated, Plaintiff said no because the plant closed. (*Id.*)

Plaintiff believed he was unable to work because his "back hurt[] constantly." (Doc. 10-3 at 37.) Plaintiff said he also had anxiety, heard voices, and would "always think someone's out to get [him] or [his] girl." (*Id.*) The ALJ noted that when Plaintiff applied for disability, he only indicated having mental issues and "[t]here was no mention of any back problems," even when Plaintiff filed for reconsideration. (*Id.* at 38.) However, the ALJ observed that Dr. Majzoubi noted that Plaintiff had back problems in a statement regarding Plaintiff's limitations and abilities from November 2012. (*Id.*) The ALJ noted the limitations assessed by Dr. Majzoubi had "no objective evidence to support it." (*Id.* at 39.) Therefore, the ALJ continued the hearing for Plaintiff to have a x-rays taken and attend a consultative examination. (*Id.*)

On June 6, 2013, Plaintiff appeared for a second hearing before the ALJ. (Doc. 10-3 at 43.) He believed he was not able to work due to pain in his "lower back and anxiety." (*Id.* at 57.) Plaintiff reported that he was taking medication that calmed him, and did not cause any side effects such as making him sleepy. (*Id.* at 45-46.) Plaintiff said no doctor recommended back surgery, injections, or physical therapy. (*Id.* at 46.) He reported that he used a cane, which was not prescribed, but helped when he was "standing in a line at the bank or something," so that he could lean. (*Id.*) In addition,

Plaintiff said he "recently got [a] cannabis card" for his low back pain, which he described as "[s]harp, aching, stabbing." (*Id.* at 47, 49.) Plaintiff testified that he asked for pain medication from his doctor, but was told, "he's not a doctor who prescribes pain medication." (*Id.* at 48.)

Plaintiff reported he did not run, jump, take long walks, or bend over when it could be avoided. (Doc. 10-3 at 49-50.) He explained that he bought "pull-on shoes because it hurts to bend over to tie [his] shoes." (*Id.*) Plaintiff estimated he was able to sit for one hour at a time, and stand for thirty minutes before he needed to sit. (*Id.* at 50.) He reported he was able to "walk around the block, but it hurt[] every step of the way," so he did not do so "too often." (*Id.*) Plaintiff said he avoided "lifting all heavy things" because his back could be "messed up for three or four days." (*Id.* at 51.)

In addition, Plaintiff testified that he had been seeing a psychiatrist, Dr. Truta, for "a couple of years." (Doc. 10-3 at 47). He stated he was never been hospitalized for mental illness, but believed he "should have been probably." (*Id.*) Plaintiff said he had difficult making decisions, and would "rather talk to somebody about it" prior to making a decision. (*Id.* at 52-53.) Further, Plaintiff reported he had memory problems, as well as difficulty with concentration. (*Id.* at 51-52.) However, Plaintiff said he remembered to take his medication because he got "the shakes" and would "start feeling manic." (*Id.* at 52.) He estimated he could concentrate for "maybe 30 minutes" before he needed to take "a 15-minute break." (*Id.* at 56-57.)

## C.   The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of January 1, 2009. (Doc. 10-3 at 14.) At step two, the ALJ found Plaintiff's severe impairments included: "major depressive disorder, bipolar disorder with psychotic features, and degenerative disc disease." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.*) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk cumulatively for six hours and sit without limitations, and occasionally bend, stoop, crouch, climb, kneel, balance, crawl, push, and pull. He should avoid work in extreme cold or damp environments. He additionally would be limited to simple routine work in a non-public setting with occasional interactions with co-workers.

9

(*Id.* at 15.) Based upon this residual functional capacity, the ALJ found "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.* at 19.) Thus, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 20.)

## DISCUSSION AND ANALYSIS

**A.     The ALJ's evaluation of the medical evidence**

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability. *Id.*; *see* 20 C.F.R. § 404.1527(c)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. § 404.1527(c)(2). Thus, the courts apply a hierarchy to the opinions offered by physicians.

A treating physician's opinion is not binding upon the ALJ, and may be rejected whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Here, Plaintiff contends the ALJ erred by rejecting the opinions of his treating physicians Dr. Majzoubi and Dr. Truta, which were contradicted by other physicians. Accordingly, the ALJ was required to set forth specific and legitimate reasons to support the decision.

1. Opinions of Dr. Majzoubi

    *a.* *Mental limitations*

As an initial matter, the ALJ failed to recognize that Dr. Majzoubi completed the Mental Disorder Questionnaire Form. (*See* Doc. 10-3 at 17.) Rather, the ALJ indicated the form was "completed and submitted by an unknown source." (*Id.*) In that form, Dr. Majzoubi opined that Plaintiff "emotionally labile," and had "[d]isorganized thoughts," paranoia, and mania. (Doc. 10-8 at 44-45.) In addition, Dr. Majzoubi opined Plaintiff was unable "to interact appropriately and communicate effectively," and "unable to adapt to stressful environments." (*Id.*) The ALJ failed to address these opinions, and did not identify any reason to reject the assessed limitations.[2]

    *b.* *Physical limitations*

The ALJ observed that Dr. Majzoubi opined Plaintiff "could lift and carry 50 pounds occasionally and five pounds frequently, sit, stand, and walk for one hour each in an 8-hour day, and occasionally bend, squat, climb, kneel, and stoop, and never crawl." (Doc. 10-3 at 16.) However, the ALJ concluded the "sitting, standing, and walking restrictions" were "over-restrictive," because they were "not consistent with the clinical medical evidence and treatment." (*Id.*)

The Ninth Circuit determined that a treating physician's opinion may be rejected where it is "unsupported by the record as a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)). Further, an opinion may be rejected when an ALJ finds inconsistencies between a treating doctor's assessment and his own medical records. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999) (explaining internal inconsistencies within a physician's report supports the decision to discount the opinion of a physician).

Importantly, however, when an ALJ believes an opinion is unsupported by the objective medical evidence, the ALJ has a burden to "set out *a detailed and thorough summary of the facts and conflicting clinical evidence*, stating his interpretation thereof, and making findings." *Cotton v. Bowen*,

---

[2] In the residual functional capacity assessment, the ALJ limited Plaintiff to work in a "non-public settling with occasional interactions with coworkers" (Doc. 10-3 at 15), but it is not clear from the record that this limitation adequately encompassed the limitations assessed by Dr. Majzoubi or addressed Plaintiff's inability "to adapt to stressful environments."

799 F.2d 1403, 1408 (9th Cir. 1986) (emphasis added). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).  Although the ALJ summarized the medical record in his decision, the ALJ failed to identify and discuss the specific evidence that conflicted with Dr. Majzoubi opinions regarding Plaintiff's sitting, standing, and walking restrictions. Rather, the ALJ offered only the conclusion that the record was "not consistent with" the limitations.

Because the ALJ failed to identify "conflicting clinical evidence" or explain how the treatment Plaintiff received was not consistent with the assessed limitations, the ALJ failed to properly evaluate Dr. Majzoubi's opinion.  *See Cotton*, 799 F.2d at 1408.

2.     Opinions of Dr. Truta

The ALJ observed, "Treating physician Dr. Mircea Truta opined that the claimant was seriously limited by not precluded and/or unable to meet competitive standards in all mental abilities and aptitudes needed to do unskilled work."  (Doc. 10-3 at 16.)  The ALJ gave "limited weight" to these opinions, finding "Dr. Truta's treatment is not consistent with the severity of these limitations." (Doc. 10-3 at 16.)

As noted above, the opinion of a treating physician may be rejected if the ALJ finds incongruity between the treatment notes and a doctor's assessment. *Tommasetti*, 533 F.3d at 1041; *see also Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (finding a treating physician's opinion was properly rejected where the treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"). However, the ALJ must "point[] to specific evidence," not merely conclude that the records are inconsistent. *See Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999).  Again, the ALJ failed to carry this burden when evaluating the opinions of Dr. Truta.

3.     Conclusion

Opposing remand of the matter for further proceedings, Defendant purports to identify inconsistencies within the record with the opinions of Drs. Majzoubi and Truta. (Doc. 16 at 6-9.)

However, the Court is constrained to review only the reasoning asserted by the ALJ, and cannot consider *post hoc* reasoning by Defendant, or even the evidence upon which the ALJ could have relied. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (noting that a reviewing court "is constrained to review the reasons the ALJ asserts" and finding error were the court affirmed the ALJ's decision "based on evidence that the ALJ did not discuss"). The Ninth Circuit explained that the Court cannot engage in "*post hoc* rationalizations that attempt to intuit what the [ALJ] might have been thinking," and cannot affirm on rationale that was not articulated by the ALJ. *Bray v. Comm'r*, 554 F.3d 1219, 1229 (9th Cir. 2009). Because the evidence identified by Defendant was not articulated by the ALJ, the Court cannot refer to it to find inconsistencies supported the ALJ's decision to give less weight to the opinions of Drs. Majzoubi and Truta. Rather, the ALJ failed to carry the burden to identify specific and legitimate reasons for rejecting the opinions of Plaintiff's treating physicians.

**B.     Remand is appropriate in this action**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the District Court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed when no useful purpose would be served by further administrative proceedings, or where the record has been fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1998).

Applying the *Smolen* factors to this case, the ALJ failed to set forth legally sufficient reasons to properly reject the opinions of Plaintiff's treating physicians, Drs. Majzoubi and Truta, related to Plaintiff's physical and mental impairments. The matter should be remanded for the ALJ to re-evaluate

the medical evidence, because it is not clear from the record that the ALJ would be required to find Plaintiff disabled if the opinions of the treating physicians were credited.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in assessing the opinions of Plaintiff's treating physicians, Drs. Majzoubi and Truta. As a result, the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510.  Given that remand is appropriate for further consideration of the medical record, the Court offers no findings on the other issues raised by Plaintiff.

Accordingly, **IT IS HEREBY ORDERED**:

1. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and

2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff James Clyde Smith and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **August 19, 2016**              **/s/ Jennifer L. Thurston**
                                                                   UNITED STATES MAGISTRATE JUDGE